HOAG *v.* ALLEN.

CANCELLATION OF INSTRUMENTS—DEEDS—FRAUD—UNDUE INFLU-
ENCE—MENTAL INCOMPETENCY OF GRANTOR—EVIDENCE—SUFFI-
CIENCY.

On a bill to set aside a deed made by the grantor to his sister
in consideration of care and support, on the ground that it
was without consideration and obtained through misrepre-
sentation, fraud, and undue influence, at a time when the
grantor was mentally incompetent to execute it, evidence
examined, and *held*, that a decree dismissing the bill was
proper.

Appeal from Ingham; Wiest, J. Submitted April 9,
1908. (Docket No. 13.) Decided May 1, 1908.

Bill by Sunderland P. Hoag and William W. Hoag
against Hannah M. Allen to set aside a deed. From a
decree dismissing the bill, complainants appeal. Affirmed.

*Joseph B. Hendee* (*Lawton T. Hemans*, of counsel),
for complainants.

*Jason E. Nichols*, for defendant.

BLAIR, J. The complainants instituted this suit to set
aside a certain deed of conveyance made and executed by
James Hoag to Hannah M. Allen on the 27th day of
March, 1901. The premises conveyed consisted of a farm
of 101 acres of land in the township of Onondaga, Ingham
county, conceded to be of the value of $4,500, and upon
which there was a mortgage of $1,000. Aside from a
small amount of personal property, the farm in question
represented all the property that James Hoag possessed.

James Hoag was a brother of the complainants and de-
fendant, Hannah M. Allen, and died on the 15th day of
October, 1903, at the age of 64 years. He resided upon

the farm at the time of his death and had resided thereon since the date of the purchase, about 1884.

James never married and, for several years after purchasing the farm, his brother Daniel, also single, lived with him upon the farm and looked after and managed the business. A house was built upon these lands by Daniel, who had some interest in the farm and who was a carpenter by trade. After Daniel went away, James had several families living with him at different times, and for some considerable portion of the time lived alone. The defendant, Hannah M. Allen, had a home at Eaton Rapids, where she resided most of the time.

About the year 1898 or prior thereto, James Hoag was taken sick. Dr. Stimson, of Eaton Rapids, was consulted and diagnosed his case as the beginning of paresis, due to syphilis, finally developing locomotor ataxia. Dr. Stimson continued to treat Mr. Hoag professionally until about 1900.

Early in January, 1901, Sunderland P. Hoag, one of the complainants, and his nephew, Will S. Hoag, went to the home of James Hoag, in response to a letter from Bert A. Allen, a son of the defendant, stating that his mother, who was then at the home of James Hoag, would be obliged to come to New York State to care for her daughter, and that it would be necessary for some one to look after his uncle James, as he did not consider him a competent person to look after himself.

Sunderland Hoag testified:

"I had a talk with Mrs. Allen about my brother upon that occasion, and before we came away she said she would not go down there but would remain here. * * * She said she would have to live with her children if she did not stay there and she would stay there; she didn't expect to charge when he was up and around anything for she got her board and could hire out her own house here. My nephew was with me on that occasion.

"*Q.* What, if anything, was said about what would be expected of her in the way of looking after Mr. Hoag, your brother?

"*A.* I talked with her, that she would look after him the same as I was looking after him all the time, both of us was to look after him to see that he did not fool away what he had.   She said he was not capable of doing business on that and other occasions.

"*Q.* Did you have some suspicion that he might get rid of his property foolishly?

"*A.* Why, she said so.  We always looked after him, myself and father when he was alive, and my brother Daniel, anything he had to do he would come to us.  We would look after him on account of his incompetency; were afraid he would make some disposition of his property.

"*Q.* Was that matter talked over with Mrs. Allen on that occasion?

"*A.* Yes; she said she would look after him to see that he did not dispose of his property foolishly, and the matter was left in that shape when we went away."

It appears that various persons had been to see Mr. Hoag about taking a deed of his farm and taking care of him, just prior to the time the deed in question was executed, and that the defendant, Mrs. Allen, had knowledge of these facts.

Complainant Sunderland P. Hoag and his nephew first learned of the deed after the death of James, and they testified that Mrs. Allen told them that the deed was taken by her to prevent James deeding the property away out of the family, and they would fix matters up among themselves and the neighbors would know nothing about it; that this talk was had on Friday night, the funeral was on Sunday, and the following Tuesday or Wednesday Hoag and his nephew went over to the place; that Mrs. Allen then told them she had seen her lawyer, Mr. Slayton, in the meantime, and that he had told her she could hold the property and she refused to surrender the deed as she had previously suggested doing and as she stated it was her purpose and intention to do.

It was following this that the bill of complaint was filed in this case and the court asked to set aside the deed in question, on the ground that the same was obtained with-

out consideration and through misrepresentation, undue influence, and fraud, at a time when, by reason of prolonged nervous and physical suffering, the mind of the said James Hoag had become weakened and impaired and he was thereby in such a condition of mind and body as to render him easily susceptible to improper and undue influence, and when with weakened power of resistance the said James Hoag was mentally incompetent to make and execute deeds of conveyance or paper writings of any kind.

A further reason assigned by the complainants for setting aside this instrument was, that the defendant, Hannah M. Allen, occupying as she did, a confidential and fiduciary relation to her brother, at the time she took the conveyance in question, and knowing his condition, both mental and physical, as she did, should not in justice and equity be permitted to retain any advantages or benefits gained by her through and by reason of such a conveyance.

The case was heard upon pleadings and proofs taken in open court, with the exception of the testimony of complainant, Sunderland P. Hoag, and defendant, Hannah M. Allen, whose depositions were read; and from a decree dismissing the bill, the complainants appeal.

In the course of his opinion, the trial judge made the following statement:

"I cannot make a finding in this case, from the testimony, that at the time James Hoag made the deed he was mentally incompetent to do so. The testimony fails to show that the making of the deed was not his intelligent purpose and desire. On the other hand, it does show that the thing done was just what he had intelligently talked over with others, and had expressed as his intent and purpose to do. He first canvassed with others the advisability of turning his property over to others than defendant, under proper safeguard for his care and support, and fully appreciated his need of care, the extent of his property and his approaching helpless physical condition. His talk with the conveyancer when the deed was made and with Dr. Long and others shows that he, in

this case, knew what he wanted and that the deed in question met his expressed intention."

After a careful consideration of the record, we have arrived at the same conclusion as that reached by the learned trial judge. There is a sharp conflict in the testimony; the proofs on behalf of complainants tending to show that, from his boyhood, James Hoag had not possessed the average strength of mind and that this weak mental condition had been aggravated by disease, resulting, in the opinion of Dr. Stimson, in paresis dementia, rendering him wholly incompetent to transact ordinary business; on the other hand, the proofs in behalf of the defendant tended to show that while the decedent, James Hoag, was an eccentric and odd person, he possessed, up to the time he was smitten by locomotor ataxia in 1898, ordinary mental ability and was competent to transact such business affairs as required his attention and that this mental condition was not afterwards so impaired as to render him incompetent to execute the deed in question. It is apparent that the circuit judge laid stress upon the testimony of the conveyancer and of Dr. Long, and evidently accepted their testimony as credible. As these witnesses appeared before the trial judge and gave their testimony in his presence and there is nothing in the record to impugn or impeach the good faith of their testimony, we ought to and do give it credence.

The physician, Dr. David Long, testified that he began treating James Hoag sometime in 1900, which was after Dr. Stimson had ceased to attend him; that he went out to see him in the spring or early part of the year 1901, which was about the time of the making of the deed, and—

"I remember the circumstance of being there, would say it was in the spring, but didn't keep the dates. At that time he talked about his condition, that he had no one to care for him and felt as though he must have some one to look after him and asked me what I thought about his deeding his property to some one and finally mentioned Mrs. Allen, that he would rather have it in the family than anywhere else; told him I didn't see why it wouldn't

be the proper thing to do because he certainly was in a condition he could not get along without some assistance. Think Mrs. Allen was there but not in the room; that was about all there was of it, that he felt as though he must have some one to look after him and wanted to know what I thought about it. He said nothing about the conditions of deeding or anything of the kind to me or anything about a contract; was there I presume half or three-quarters of an hour; never had any other impression but what his mind was all right, never saw anything but what it was; saw nothing during any of the time I treated him that led me to believe he was not of sound mind and capable of disposing of his property."

Mr. Fred J. Slayton, an attorney at law at Eaton Rapids, who drew the deed in question, testified:

"Mr. Hoag told me he wanted a life lease drawn; first he wanted to deed his property to his sister, Mrs. Allen, for his care, support and maintenance during the balance of his life; she was living there at the time; don't know how long she had been there; when I got there they had Exhibit B. It was signed by the Davenports when I received it or when the notary received it, I had nothing to do with this. This is the contract. Mr. Hoag handed it to me when I arrived there. The matter was talked over there by Mr. Hoag at the time I drew the deed, all gone over. He wanted me to draw up a deed subject to a mortgage held by the Michigan State Bank of $1,000 and subject to a contract, and said he had had some counsel in relation to a life lease. When I started I drew the deed first, then Mr. Hoag says, Will it be necessary for me to have a life lease? I says, that is the usual way of fixing matters of that kind. He says, I have been informed that if the deed states it is subject to a life lease it is not necessary to go any further if it is carried out. I says, I will draw it as you want it, but tell you the usual way. He says, it will save recording and drawing one paper, so I drew the deed and he wanted it subject to a life lease to Hannah Allen; informed him that was all right and it could be done that way. He talked of the agreement at that time, that Hannah Allen was to become a party to a contract and I supposed her name was inserted in the contract as one of the parties. She signed it, but the contract was drawn in the State of New York and her name doesn't appear in the caption of the contract; she signed

the contract in my presence, then it was marked out because the notary had her sign it and it was discovered afterward that Hannah Allen was not a party to that contract.

"*Q.* Now, was that matter of this contract and of the deed fully talked over and understood or fully talked over there by Mr. Hoag or by you or by Mrs. Allen in his presence?

"*A.* Yes, I think he fully understood the full arrangement.

"*The Court:* The Exhibits A and B may be considered as read and used.

"*A.* I think I was there possibly an hour. Mr. Hoag was there in my presence all of the time talking about this matter; didn't notice that he became particularly tired or not; I think he fully understood the matter; think he understood the extent of his property, amount of it and those that would naturally be entitled to his bounty; didn't observe anything that indicated he didn't comprehend and understand the deal fully, and nothing that suggested to my mind he had been unduly influenced by Mrs. Allen in regard to the matter.    *    *    *

"*Q.* Do you recall this clause in the deed:

"'This deed is given subject to a certain agreement dated March 22, 1901, made and executed by Elias E. Davenport and Mary E. Davenport, husband and wife, and Hannah M. Allen to said James Hoag, which, among other things, is given for care, support and maintenance of said James Hoag, also subject to a mortgage of $1,000, held by the Michigan State Bank and subject to a life lease from Hannah M. Allen to James Hoag?'

"*A.* Yes, sir.

"*Q.* You knew all of those facts when you put them in the deed?

"*A.* I knew those facts from James Hoag.

"*Q.* You are sure you got them all from him?

"*A.* He told me what he wanted done and I drew the deed.

"*Q.* But have you a distinct recollection of all that happened out there and all that was said?

"*A.* I don't think of all that was said, no.

"*Q.* Could you now state positively whether Mrs. Allen did the talking?

"*A.* I think they both talked about it.

" *Q.* Have you any distinct recollection about who said anything there?

" *A.* Mr. Hoag told me about the way he wanted it drawn and I drew it."

Mr. John T. Hall, a witness for the complainants, upon whose testimony complainants' counsel lay considerable stress, testified that he had been alderman, mayor of the city of Eaton Rapids, and sheriff of Eaton county from 1897 to 1899, and had known James Hoag about 15 or 18 years; that he went to see Mr. Hoag in the early part of 1901:

" Mr. Hoag said he would like to get somebody to take care of him.

" *Q.* Did you notice any failing condition in his mind, whether it was strong as it had formerly been?

" *A.* Why, in regard to that, I did not see much difference in him as I know of as I had before.

" *Q.* Did he say anything to you there about deeding the farm to you?

" *A.* Yes, sir, he wanted me to take his farm and take him and take care of him; wanted me to take him to Eaton Rapids.

" *Q.* That he was not having proper care there?

" *A.* That was what he thought, yes, sir. That was the first time I was down there. I was there again in February, 1901, I think.

" *Q.* How did you happen to go down at that time, Mr. Hall?

" *A.* Why, I had been talking about Mr. Hoag and I thought I would take a man out with me and look him over and see what he thought about it, and so I took out Mr. Webster.

" *Q.* What, if any, talk was had at that occasion about the farm?

" *A.* We talked it all over and he seemed very anxious to come, and I told him I would not consent to it a minute without having some doctor examine him and see that his people were satisfied. There was a suggestion made about his going to Eaton Rapids to be examined by a physician.   *   *   *

" *Q.* From the condition that he was in, Mr. Hall, would you have been willing to have taken a deed of conveyance from him and paid him a consideration for his

farm, or entered into any arrangement for taking care of him without some independent advice to him, or without knowing that the arrangement would have been agreeable and satisfactory to his people and his relatives?

"*A.* I would not.   *   *   *

"He seemed to talk rationally; I didn't notice any difference than what he had ever been much.   He talked rationally on any talk with regard to the purchase of property.   *   *   *

"I went out the second time for the purpose of seeing him about taking him, had talked with my wife about it and we had made up our minds that if Mr. Hoag was competent, to take him and take care of him for that farm, and had talked over about what Mr. Hoag's farm was worth and the arrangements had been talked over and in lieu of the fact that he would deed the farm to us to take him and take care of him the rest of his·life, clothe him, pay his doctor bills and everything of that kind and bury him, it was agreed that a contract should be drawn up to that effect and he was to make a deed of the property to me and give him a life lease of the property.   I was to have the avails of the farm and give him a life lease.   I thought that Mr. Hoag appeared to be a man at that time who understood and comprehended what I was saying to him; I thought he understood the nature of a contract of that character and kind and appreciated it fully.   I was talking about both Mr. Hoag and Mrs. Allen."

We find no evidence in the case to indicate that there was any agreement between Mrs. Allen and her brothers that she should represent them in caring for their brother or that she should obtain a deed as trustee for them, or that any fiduciary relation existed between them and her. So far as any relations of trust and confidence existed between her and her brother James, there is nothing to indicate that she in any way abused her position.   It is clear, upon the record, that James required constant· attention and that his care was fraught with very disagreeable consequences.   The contract entered into· fully protected James and was an eminently proper contract for him to make.   Apparently he had sufficient mind to understand this himself and had endeavored to make a similar one with strangers.   He had talked this matter over

with disinterested persons prior to making the contract and they had advised him to make such a contract and one of them, at least, had advised him to make it with his sister.

The contract was evidently considered a proper contract by Mr. Hall and it seems clear that the reason why Mr. Hall was inclined to insist upon the examination by a physician or independent advice and the consent of the family was that he might have no friction or litigation in future, rather than any doubt on his part of the mental competency of James to make the contract.

We are of the opinion that complainants failed to establish their case by a preponderance of the evidence. It was conceded, and we think very properly, upon the oral argument, that the record contained no evidence of undue influence, and upon the whole record we are satisfied that the trial judge arrived at a correct conclusion upon the facts, and the decree is affirmed, with costs of both courts to defendant.

MONTGOMERY, OSTRANDER, HOOKER, and MOORE, JJ., concurred.